Exhibit 3

> UNITED STATES OF AMERICA, - against - ERIC MILLAN, Defendant.
> UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
> 2020 U.S. Dist. LEXIS 59955
> 91-CR-685 (LAP)
> April 6, 2020, Decided
> April 6, 2020, Filed

**Editorial Information: Prior History**

Pierre v. Vannoy, 891 F.3d 224, 2018 U.S. App. LEXIS 13506 (5th Cir. La., May 23, 2018)

**Counsel** {2020 U.S. Dist. LEXIS 1}For United States Of America, Plaintiff: Dietrich L. Snell, LEAD ATTORNEY, Office of New York State Attorney General, New York, NY, Elisha Jonathan Kobre, United States Attorney Office, SDNY, New York, NY; Emily Anne Johnson, USAO, US Attorney's Office, SDNY, New York, NY; Jonathan Rebold, U.S. Attorney's Office For The Southern District of Ne, New York, NY.

**Judges:** Loretta A. Preska, Senior United States District Judge.

Opinion

**Opinion by:** Loretta A. Preska

Opinion

LORETTA A. PRESKA, SENIOR UNITED STATES DISTRICT JUDGE:

Before the Court is Eric Millan's motion (dkt. no. 1046), pursuant to 18 U.S.C. § 3582(c)(1)(A), for an Order reducing his life sentence (of which he has already served more than 28 years) to time served.1 The Government opposed the motion (dkt. no. 1052), and the parties filed additional letters (dkt. nos. 1057-1059). For the reasons that follow, the motion is granted.

I. PERSONAL BACKGROUND

Mr. Millan, approximately age 57, was born and raised in New York City, the younger of two children. (PSR ¶ 171.) Initially reared in an intact family on Manhattan's Lower East Side, his parents separated when he was 14 years old. (Id. ¶ 172.) Mr. Millan's father was killed in an automobile accident at age 54, when Mr. Millan was 28 years old.{2020 U.S. Dist. LEXIS 2} (Id.) During his youth, Mr. Millan's mother worked, and his grandmother "took care of" him and his sister, Lillian. (Exhibit 3 to Mr. Millan's Memorandum of Law, dkt. no. 1047.) They were, according to Mr. Millan's mother, "a very close knit family." (Id.) Mr. Millan and his sister, Lillian, were particularly devoted to one another, and she notes that "his absence" since 1991 "has caused me great grief." (Exhibit 4.) Mr. Millan had a bright future before his involvement in the drug trade. He "maintained excellent scholastic standing" at La Salle Academy, the high school from which he graduated in June 1980. (PSR ¶ 181.) Mr. Millan was admitted to and entered the College of Pharmacy and Health Sciences at St. John's University in Queens to receive education and training as a pharmacist. (PSR ¶ 182.) He withdrew after one year (PSR ¶ 182).

Mr. Millan has three children--Eric, Jr., Erica, and Crystal, who were approximately 9, 6 and 3 years

DISHOT 1

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

old, respectively, at the time of his 1991 arrest. (PSR ¶¶ 174-76.) Eric Millan, Jr., approximately age 37, who works today at Wavecrest Management Group (a real estate management company), wrote of how he almost followed in his father's footsteps but{2020 U.S. Dist. LEXIS 3} that his father--from behind bars--steered him onto the right path, just as Mr. Millan has done for dozens of troubled youths through his participation in FCI Fairton's "R.O.P.E. Program" (detailed below). (Exhibit 5.) Mr. Millan, Jr. wrote of how "the effects of my not having a father figure at home took its toll" when he entered junior high school. (Id.) In particular, Mr. Millan "received troubling reports from [his wife] about [Mr. Millan, Jr.'s] behavior in school and the news of getting arrested for trespassing, while [he] was supposed to be in school." (Id.)

Rather than reacting with anger, Mr. Millan "faithfully call[ed]" his son "every week to see how I was doing and to counsel [him] about [his] behavior." (Id.) In doing so Mr. Millan would "explain the consequences of [his son's] defiant behavior." (Id.) According to his son, Mr. Millan "used his experiences, and the mistakes of others, to educate me, and to illustrate what my negative behavior could lead to. He hammered home his main them: that I could eventually end up sharing a prison cell with him, a scenario that haunted him." (Id.) Mr. Millan, Jr. and his father "became the best of friends" because of his father's guidance{2020 U.S. Dist. LEXIS 4} and advice. (Id.) As Mr. Millan, Jr. put it, "as I got older, I realized that by pushing me, prodding me, counseling me, my dad was doing his best to lead me down the right path in life. After 25 years of developing a relationship with my father while he has been in prison, I can now say that we have an incredibly strong bond together." (Id.)

Crystal Lee Millan-Vargas, approximately age 31, graduated from Brooklyn College with a Bachelor's Degree in Speech-Language Pathology. (Exhibit 6.) She also holds a Master's Degree in Social Work from Fordham University. Ms. Millan-Vargas wrote principally about the academic guidance that her father provided over the years. Initially she noted that "[t]hroughout elementary school, I would often receive homework assigned by my dad, not my teacher. My dad made it a priority to mail me math homework, times tables work, mostly. He knew I despised the multiplication table, and he made sure to follow-up with a call to see if my homework was completed and ready to be mailed back to him for correction." (Id.) Of middle school she explained how her "dad and I would read the same book and discuss it over our 15 minute-limit calls. [He] knew I disliked reading,{2020 U.S. Dist. LEXIS 5} but ensured that I had my daily dose of edification." (Id.) And, of high school Ms. Millan-Vargas described her frustration with the limited access she had to her father, writing that "[m]y high-school days were the years when I complained about our 15-minute calls the most. I was often left with several replies in my mouth as the call ended. I would then have to wait until the next call rotation between my siblings before our conversation could continue. Throughout high school, a 15-minute call every week, or a visit to FCI Fairton once every other a month, was not enough." (Id.) Finally, Ms. Millan-Vargas wrote the following concerning the love, support and guidance she received from her father as she grew into the woman she is today:

> My dad proved to me that, no matter where you are, you can be successful. His achievements and prayers, combined with my desire to surpass my dad, inspired me to become the proud holder of a bachelor's degree in speech-language pathology.

> As a married, working woman and a mother of a 10 year old, I still need my father.... I need to be able to call my dad when an issue arises, when I have a question about the bible, or when I need someone to babysit{2020 U.S. Dist. LEXIS 6} my son because the sitter is sick. That last one can only happen if he comes home.(Id.) Also, Ms. Millan-Vargas writes: "I can honestly say that when I blew out the candles on my birthday cake, instead of wishing for a pony or rollerblades, I secretly wished for my dad to come home." (Id.)

DISHOT 2

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Mr. Millan's Offense Conduct

Mr. Millan was charged pursuant to a July 30, 1991 criminal complaint with participating in a conspiracy--the "Blue Thunder" organization--to distribute heroin in the Bronx and Manhattan. (Dkt. No. 1.) The "Blue Thunder" organization was "a hierarchical, pyramid-like structure composed of numerous tiers of positions associated with various levels of responsibility" that "[e]mploy[ed] dozens of individuals and a complex network of locations used to stash, process, package, and distribute its heroin and heroin sales proceeds." (PSR ¶¶ 119-20.) Mr. Millan was "[a]t the top of the pyramid," that is, he was the "proprietor and leader of the Blue Thunder organization." (Id. ¶ 120.) He delegated day-to-day responsibility for its operations to three lieutenants--Ralph Rivera, Miguel Kercado and Carlos Rivera. (Id.) Alfred V. Bottone and Alfred{2020 U.S. Dist. LEXIS 7} Bottone, Jr. supplied the majority of heroin to the "Blue Thunder" organization. (Id. ¶ 124.)2 In total the Probation Department estimated that the "Blue Thunder" organization trafficked in 501.28 kilograms of heroin from in or about 1986 to August 1, 1992. (Id. ¶¶ 129-50.) Mr. Millan's PSR contains no assertion or allegation that he (or anyone else associated with the "Blue Thunder" organization) ever engaged in any acts of violence or trafficked in/used any weapons.

### B. Mr. Millan's Arrest and Indictment

On August 1, 1991 Mr. Millan was arrested and detained without bail. (PSR at 1.) On August 14, 1991 the Government filed an indictment charging him and twenty-six other individuals with a variety of narcotics-related offenses. (Dkt No. 166.) It thereafter filed several superseding indictments. Ultimately, on October 6, 1992, the Government filed a ninth superseding indictment (the "Superseding Indictment") naming eighteen defendants and alleging seventeen counts. (Exhibit 7.) Mr. Millan was charged therein with the following offenses:

(Id.) The Government filed a redacted indictment for purposes of trial (the "Redacted Indictment"). (PSR ¶¶ 91-103.). It charged Mr. Millan as follows:

(Id.)

### C. The Mistrial in Mr. Millan's First Trial{2020 U.S. Dist. LEXIS 9} and His Conviction at Retrial

The "Blue Thunder" trial began on March 8, 1993 before the Honorable Shirley Wohl Kram and a jury. Following several disclosures of police misconduct and disclosure that Mr. Millan's attorney, Michael Pollock, was facing indictment on felony tax charges in the United States District Court for the District of New Jersey, Judge Kram declared a mistrial United States v. Millan-Colon, 829 F. Supp. 620, 626 (S.D.N.Y. 1993).

On May 9, 1994 Mr. Millan was convicted at re-trial on Counts 1, 2, 3 and 9 of the Redacted Indictment (corresponding to Counts 1, 6, 7 and 13 of the Superseding Indictment). (PSR ¶ 104.) He thereafter pled guilty to a criminal forfeiture charge (Count 17) in the indictment. (PSR ¶¶ 85, 104.)

### D. The Probation Department's Calculation of Mr. Millan's Guidelines Offense Level for His Narcotics-Related Convictions

The Probation Department grouped Mr. Millan's convictions on Counts 1, 2 and 3 of the Redacted Indictment (corresponding to Counts 1, 6 and 7 of the Superseding Indictment) together for purposes of calculating his offense level under the United States Sentencing Guidelines (the "Guidelines") for his narcotics-related convictions. (PSR ¶¶ 154-55.) It then used Section 2D1.1 of the Guidelines to calculate that offense level. (Id.)

DISHOT 3

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

In {2020 U.S. Dist. LEXIS 10} particular, Section 2D1.1 of the Guidelines instructs that the base offense level for any narcotics-related offense is determined by the total weight of narcotics distributed by a defendant (and those with whom s/he conspired) as detailed in the quantity tables of that section of the Guidelines. Based on its estimate that the "Blue Thunder" organization trafficked in 501.28 kilograms of heroin, the Probation Department determined that Mr. Millan's base offense level for his narcotics-related convictions was 42. (Id. ¶ 156.) It then increased that offense level by 4 levels pursuant to Section 3B1.1(a) of the Guidelines based on Mr. Millan's leadership role with respect the "Blue Thunder" organization. (Id.) Thus, in total, the Probation Department determined that Mr. Millan's adjusted Guidelines offense level for his narcotics related convictions was 46. (Id.)

### E. The Probation Department's Calculation of Mr. Millan's Guidelines Offense Level for His Continuing Criminal Enterprise Conviction

Section 2D1.5 of the Guidelines provides that the offense level for a continuing criminal enterprise conviction (21 U.S.C. § 848(b)) is the greater of 38 or 4 plus the base offense level for the underlying criminal conduct. As detailed above, the Probation Department determined that the base offense level for {2020 U.S. Dist. LEXIS 11} Mr. Millan's underlying criminal conduct (his narcotics-related convictions) was 42. Thus, the Probation Department determined that Mr. Millan's offense level for his continuing criminal enterprise conviction was 46 (4 + 42 = 46).3 (Id. ¶ 157.) Regardless of the foregoing, though, engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(b) is punishable by a mandatory life sentence.

### F. Mr. Millan's Sentencing

Mr. Millan appeared before Judge Kram for sentencing on October 5, 1994--three weeks before the effective date of Amendment 505 to the Guidelines and, thus, three weeks before his Guidelines offense level for both his narcotics-related convictions and his continuing criminal enterprise conviction would have been 42 (360 months to life), not 46 (life). (Exhibit 10.) Mr. Millan's attorney argued about the drug quantity distributed by the "Blue Thunder" organization (Exhibit 10 at 3:12-4:13) and that Mr. Millan "was always ready, willing and able to plead guilty and accept responsibility to something other than a life count" but that the Government never made a plea offer to anything other than an offense that would have generated a Guidelines offense level mandating a life sentence {2020 U.S. Dist. LEXIS 12} (unless Mr. Millan cooperated with the Government). (Id. at 5:6-6:4.) Counsel acknowledged, however, that his arguments were "academic in light of [Mr. Millan's] conviction under [21 U.S.C. § 848(b)] which mandates that the court impose, whether it likes it or not, a sentence of life imprisonment." (Id. at 6:9-13.) And that is exactly what Judge Kram did, stating that "[u]nder the circumstances I feel it is my obligation to sentence you to life incarceration, and a 5-year period of supervised release." (Id. at 10:17-11:4; Exhibit 11.)

### G. Mr. Millan's Direct Appeal

Mr. Millan timely appealed his conviction and sentence. On April 14, 1997, the Court of Appeals affirmed that conviction and sentence (and those of several of his codefendants). United States v. Rosario, 111 F.3d 124 [published in full-text format at 1996 U.S. App. LEXIS 39235] (2d Cir. 1997). Mr. Millan filed an unsuccessful petition for an en banc rehearing but did not file a petition with the U.S. Supreme Court for a writ of certiorari.

### H. Mr. Millan's Other Post-Conviction Litigation

Following denial of his direct appeal, Mr. Millan engaged in limited additional post-conviction litigation.

First, on or about May 19, 1998, Mr. Millan filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set

DISHOT 4

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

aside or correct his sentence on the grounds of Ineffective assistance of counsel,{2020 U.S. Dist. LEXIS 13} multiple due process violations, improper jury instructions, prejudicial variance from the indictment, denial of cross-examination, and sentencing errors. (Dkt No. 672.) On or about November 1, 1999, Judge Kram denied that motion. (Exhibit 12.)

Second, on or about May 21, 2000, Mr. Millan filed a pro se second or successive 28 U.S.C. § 2255 motion arguing that, pursuant to Richardson v. United States, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999), the jury at his trial had been improperly charged on the continuing criminal enterprise (21 U.S.C. § 848(b)) charge because that jury was not instructed to agree unanimously on specific instances of narcotics trafficking. (Exhibit 13.) On June 5, 2000, the Clerk of the Court of Appeals advised Mr. Millan that he would need to apply to the Court of Appeals for authorization to file a second or successive 28 U.S.C. § 2255 motion. (Exhibit 14.) On or about July 20, 2000, Mr. Millan submitted that application. And on August 17, 2000, the Court of Appeals denied his application to file a second or successive 28 U.S.C. § 2255 motion. (Exhibit 15.)

Third, during the course of a subsequent, unrelated criminal case before the Honorable Nicolas G. Garaufis in the United States District Court for the Eastern District of New York against Mr. Millan's co-defendant, Vincent "Vinny Gorgeous"{2020 U.S. Dist. LEXIS 14} Basciano, who was by then the Acting Boss of the Bonanno Crime Family, Mr. Basciano sought to introduce evidence of his acquittal at the "Blue Thunder" trial. The Government responded that, if such evidence were admitted, it would offer evidence that Mr. Basciano had bribed a juror at the "Blue Thunder" trial to assure his acquittal--apparently the first time that the Government ever revealed its knowledge of jury tampering at the "Blue Thunder" trial (though it no doubt knew of that jury tampering for years beforehand). (Exhibit 16 at 7577:8-78:21.)4 Based on that disclosure, between October 6, 2009 and December 7, 2009, Mr. Millan and three of his co-defendants (Myles Coker, Alfred V. Bottone, and Jose Colon) separately filed petitions pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure, or, alternatively, sought writs of audita querela or coram nobus, or, alternatively, sought an evidentiary hearing to vacate their convictions based on Mr. Basciano's jury tampering at the "Blue Thunder" trial. (Exhibit 17.)

On December 29, 2009, the Honorable Richard M. Berman referred those petitions to United States Magistrate Judge Michael H. Dolinger for preparation of a Report and Recommendation. (Id.) And, on June 13, 2011, Magistrate{2020 U.S. Dist. LEXIS 15} Judge Dolinger issued his Report and Recommendation, finding that "habeas is the proper vehicle for the petitioners' jury tampering claims and that each of the four petitioners had previously filed one or more motions to vacate their convictions under § 2255." (Id.) He therefore recommended that Judge Berman construe the motions of Messrs. Millan, Coker, Bottone, and Colon as second or successive 28 U.S.C. § 2255 motions and transfer them to the Court of Appeals for consideration. (Id.)

On October 31, 2011 Judge Berman adopted Magistrate Judge Dolinger's report and recommendation and transferred Mr. Millan's motion to the Court of Appeals for screening. (Exhibit 18.) On November 4, 2011 the Court of Appeals notified Mr. Millan to file an application for authorization to file a second or successive 28 U.S.C. § 2255 motion. (Exhibit 19.) Mr. Millan, however, never did so. (Id.) Thus, on February 7, 2012, the Court of Appeals denied Mr. Millan's motion for a second or successive 28 U.S.C. § 2255 motion. (Id.)

III. DISCUSSION

A. This Court has the Authority to Reduce Mr. Millan's Sentence to Time Served Pursuant to 18 U.S.C. § 3582(c)(1)(A)

Mr. Millan moves pursuant to 18 U.S.C. § 3582(c)(1)(A). That section provides that district courts can

DISHOT 5

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

modify a "final term of imprisonment" if "extraordinary{2020 U.S. Dist. LEXIS 16} and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A).

First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Put differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate{2020 U.S. Dist. LEXIS 17} that the sentence initially imposed on any individual defendant no longer served legislative objectives.

Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any "extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances:"

> The [Senate Judiciary] Committee{2020 U.S. Dist. LEXIS 18} believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, <u>cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence</u>, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment. Id. at 55-56 (1983) (emphasis added)

Third, notwithstanding all of the foregoing, Congress originally conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts--until the recently enacted First Step Act--were only authorized to reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

B. <u>The U.S. Sentencing Commission Has Indicated that the "Extraordinary and Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) May Be Based Are Not Limited to Medical Condition, Age and Family Circumstances</u>

In enacting the Comprehensive Crime Control Act of 1984, Congress{2020 U.S. Dist. LEXIS 19} tasked the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for

DISHOT 6

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). When the Sentencing Commission acted in 2007, it promulgated a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698).

Thereafter, in April 2013, the Office of the Inspector General of the Department of Justice (the "OIG") issued a report finding that the Director of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions (even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence reduction). See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013) (Exhibit 20).5 In response, the Sentencing Commission expanded its guidance to district{2020 U.S. Dist. LEXIS 20} courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines. See U.S.S.G. § 1B1.13, Application Note 4; United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age and family circumstances. U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted).

Finally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop standards for identifying "extraordinary and compelling reasons" for a sentence reduction: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). On one hand, lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby{2020 U.S. Dist. LEXIS 21} creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984. On the other hand, legislators' use of the modifier "alone" evidences that they believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

In late 2018, Congress passed the First Step Act, which, among other things, fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions are adjudicated. In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden{2020 U.S. Dist. LEXIS 22} of the defendant's facility," whichever happens first. See 18 U.S.C. § 3582(c)(1)(A); United States v. Beck, Case No. 13-Cr-186-6, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505, at *5 (W.D.N.C. June 28, 2019) ("Among other things, [the First Step Act] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BoP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

DISHOT                                  7

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

Thus, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See Beck, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"). And courts have utilized that power.

United States v. Cantu-Rivera, Case No. 89-CR-204, 2019 U.S. Dist. LEXIS 105271, 2019 WL 2578272 (S.D. Tex. June 24, 2019), is instructive with regard to court's newfound authority to reduce sentences based on "extraordinary and compelling{2020 U.S. Dist. LEXIS 23} reasons" (even if those reasons do not relate to medical condition, age or family circumstances). Initially, the court in Cantu-Rivera explained that "[t]he First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to modify sentences of imprisonment upon motion by the defendant if the defendant has fully exhausted all [BOP] administrative rights . . . or 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 2019 U.S. Dist. LEXIS 105271, [WL] at *1 (internal quotation marks omitted). It then reduced that defendant's life sentence (for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine) to time served (after service of more than 30 years imprisonment) based principally on "the extraordinary degree of rehabilitation Mr. Cantu-Rivera has accomplished during the 30 years he has been incarcerated," including "extensive educational achievements," such as "completion of over 4,000 hours of teaching while in federal prison to complete a Teaching Aide apprenticeship with the Department of Labor," his "service as a teaching assistant in several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his{2020 U.S. Dist. LEXIS 24} service in the BOP's suicide watch program, helping to care for inmates placed in solitary confinement due to suicide attempts." 2019 U.S. Dist. LEXIS 105271, [WL] at *2.

Similarly, in United States v. Cantu, Case No. 05-CR-458, 2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court noted that "[a] court may now," pursuant to 18 U.S.C. § 3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" 2019 U.S. Dist. LEXIS 100923 [WL] at *1. It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines. 2019 U.S. Dist. LEXIS 100923, [WL] at *3.

And, in United States v. McGraw, Case No. 02-CR-00018, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court stated that the First Step Act's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction."{2020 U.S. Dist. LEXIS 25} 2019 U.S. Dist. LEXIS 78370 at *6, [WL] at *1. It then reduced that defendant's life sentence (for possession with intent to distribute methamphetamine) to time served (after service of more than 17 years imprisonment) based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

gang. 2019 U.S. Dist. LEXIS 78370 at *11, [WL] at 2-6.

### IV. MR. MILLAN HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

On August 5, 2019, Mr. Millan filed a request for a sentence reduction motion with the warden of the facility in which he is incarcerated (FCI Fairton in Fairton, NJ). (Exhibit 22.) More than 30 days passed before Mr. Millan received a response (on October 22, 2019) from the warden at FCI Fairton rejecting his request for a sentence reduction motion. (Exhibit 23.) Thus, Mr. Millan is now statutorily authorized to present this Court directly with the instant 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion.

### V. EXTRAORDINARY AND COMPELLING REASONS SUPPORT THE REDUCTION OF MR. MILLAN'S LIFE SENTENCE TO TIME SERVED

To date, Mr. Millan, a non-violent, first-time offender, has served more than 28 years of the life sentence imposed by Judge Kram following his conviction at trial for his involvement in the "Blue Thunder"{2020 U.S. Dist. LEXIS 26} heroin distribution organization. He was a leader of a large-scale narcotics distribution organization, a most serious crime. Nevertheless, almost thirty years is a long time behind bars by any measure for anyone. See United States v. McGraw, 2019 U.S. Dist. LEXIS 78370, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019) ("Mr. McGraw has been in custody since September 2002--nearly 17 years. That is a significant sanction").

Mr. Millan is no longer the immature and irresponsible young man who committed his offenses in his early 20s. Rather, today he is a more mature and evolved adult of 57 years. In the almost three decades that have passed since he was arrested (and detained) in 1991, and despite having had no realistic hope of release, Mr. Millan has done everything in his power to rehabilitate himself, as demonstrated by his genuinely exceptional accomplishments and meritorious prison record. He is remorseful and contrite and has fully accepted responsibility for his crimes. In the almost three decades that he has been incarcerated, Mr. Millan has conducted himself as a model prisoner and demonstrated exceptional character. He has developed into a man of great faith and a leader of the religious community at FCI Fairton and has demonstrated a commitment to working worth at-risk youth{2020 U.S. Dist. LEXIS 27} and suicide-prevention. Section 3553(a)(6), the need to avoid unwarranted sentencing disparities, also counsels granting the motion based on his co-defendants' terms of imprisonment. Finally, with regard to § 3553(a)(2)(C), the need to protect the public from further crimes of this defendant, Mr. Millan has the support of BOP staff at Fairton for a time-served sentence based on their belief that, if released, he would be a productive member of society. Accordingly, the Court finds that "extraordinary and compelling reasons" exist for the reduction of Mr. Millan's life sentence to time served.

#### A. Mr. Millan Is Fully and Unconditionally Rehabilitated

Notwithstanding his circumstances and the harsh conditions of his confinement, Mr. Millan has maintained an extraordinarily positive outlook and attitude and has sought to improve himself to the utmost extent possible. Among other things, Mr. Millan successfully completed dozens upon dozens of BOP rehabilitative programs involving more than 7,600 hours of programming and apprenticeships. See Exhibit 24 (BOP Inmate Education Data Transcript) and Exhibit 25 (BOP Inmate Skills Development Plan). Additionally, he completed a 1,000-hour apprenticeship in Computer Equipment Operations,{2020 U.S. Dist. LEXIS 28} for which he earned certificates from the State of New Jersey (Exhibit 26) and the U.S. Department of Labor (Exhibit 27). He also recently finished a 4,000 hour apprenticeship in Administrative Office Management that was certified by the State of New Jersey. (Exhibit 28.) In a word, Mr. Millan has a well-developed record of rehabilitation.

More impressively, Mr. Millan earned his Associates Degree in Business Administration from

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

Cumberland County College and maintained a GPA of 3.61 in doing so. (Exhibit 29.)6 One of his professors, Megan Hart-Macy, wrote the following about Mr. Millan:

> It is with great pleasure that I recommend Eric Millan for an educational reference. I have spent the past year and a half as his professor at FCI Fairton, and had the pleasure of working with him and observing his most recent work in Business Communications.
>
> Eric is very diligent, and puts an incredible amount of effort in everything he does. He works well with teams, and has given me exceptional work. This past semester, he and his teammates presented an oral and written business/marketing plan, as well as a complete career portfolio. His work superseded any work I have seen teaching at other colleges{2020 U.S. Dist. LEXIS 29} and universities. The dedication, drive and positive choices he makes in pursuing his college education shows clearly through his work time and time again.(Exhibit 32.) Upon graduation, Mr. Millan was selected to present a graduation speech to approximately 100 people at FCI Fairton (where he is currently incarcerated), including three other graduates, family members of graduates, other inmates working towards various educational goals, and members of the FCI Fairton staff. (Exhibit 33.)

In addition to his educational and rehabilitative accomplishments, Mr. Millan has worked at what amounts to a full-time job for the last 18-plus years. He was hired by the UNICOR-Federal Prison Industries' factory manager (for an electronic cable factory) in January 2001 as his personal production clerk. After two years of training by the clerk he replaced (who was released from prison), Mr. Millan became the factory manager's clerk. He was awarded the highest pay grade and has served as the assistant to five different factory managers since 2003. Mr. Millan's work consists principally of scheduling orders, procurement (i.e., making sure that the correct parts are on order to arrive at the right time),{2020 U.S. Dist. LEXIS 30} following up on delinquencies, securing on-time deliveries, and ensuring that each production line is operating efficiently.

Although Congress provided that rehabilitation alone cannot serve as an "extraordinary and compelling reason" for a sentence reduction, Mr. Millan's educational and rehabilitative accomplishments are unique and distinctively important because he engaged in all such positive activities without any tangible incentive other than self-improvement, given that his life sentence meant that he could neither earn any "good-time" credit nor receive any other sentence reduction benefit. Simply put, Mr. Millan, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve himself to the utmost extent possible and was motivated to do so notwithstanding his circumstances. The Court finds this to be an extraordinary and compelling circumstance.

B. Mr. Millan Is Remorseful, Contrite, and Accepts Full Responsibility for His Criminal Conduct

The words of Mr. Millan's family, as well as the BOP Staff who have known him for close to 30 years, evidence the tremendous impact that his conviction has already had on him, the punishment he has been{2020 U.S. Dist. LEXIS 31} visiting on himself for almost three decades, and the genuine remorse and regret he feels. For example:

> "As his clergy of record, he confides in me. He has never been bitter, blaming, or bemoaning his circumstances. He accepts full responsibility for what he has done. He regrets it, and has turned from and repented it." (Exhibit 34.)

> "Mr. Millan-Colon is a man who does not dodge responsibility for the mistakes he has made. His remorse and contrition are genuine. So is his quest to redeem himself. His profound Christian faith compels him to seek a life of humility, devotion, decency, and charity. He tries to be the best man that he can be." (Exhibit 35.)

DISHOT                                              10

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

"Mr. Eric Millan-Colon has turned his life around. He recognizes the mistakes that he has made and now dedicates himself to atoning for them, to redeeming himself." (Exhibit 36.)

"I have known Eric for 20 years now and know he is not the same person who entered into the prison system so many years ago. Eric has always accepted responsibility for his illegal actions and is very remorseful for any harm he has caused the community he lived in and for the pain he has caused his family . . . [H]e is a changed man . . . ." (Exhibit 38.){2020 U.S. Dist. LEXIS 32}

"I believe that 25 years is enough time in prison for a man to have atoned for his past mistakes and proven that he has turned his life around. . . . I truly believe that my dad is sincerely remorseful for his past behavior, and will prove to be one of your true success stories." (Exhibit 5.)

The Court finds that Mr. Millan is extraordinarily remorseful.

### C. Mr. Millan Has Conducted Himself as a Model Inmate and Demonstrated Exceptional Character

The Corrections Officers and other BOP staff at FCI Fairton consistently describe Mr. Millan as a "model inmate," that is, a reliable, considerate, and trusted inmate with integrity and a positive attitude.

First, Michael Coard, a Correctional Counselor at FCI Fairton, has known, worked with, and observed Mr. Millan since approximately 2000. (Exhibit 35.) Among other things, he noted Mr. Millan's "exemplary character" and affirmed that Mr. Millan "always validated my faith in his commitment to help others." (Id.) Mr. Coard further reported that Mr. Millan "has a knack for turning a negative into a positive," writing as follows:

> When FCI Fairton launched a new program of therapy and rehabilitation, I would quickly recruit Mr. Millan-Colon as a chief{2020 U.S. Dist. LEXIS 33} player on my team. Given the chance to cull the roster of prospective inmates, I always put Mr. Millan-Colon at the top of my list. He was a positive force in the R.O.P.E. program [detailed below], giving impassioned testimonials to youths who were in danger of traveling the hard road to prison. He was a strong voice of reason and redemption . . . .(Id.) Additionally, Mr. Coard stated that he personally "selected" Mr. Millan "to be an integral member of all of the important programs" because he is an "invaluable source of energy and inspiration." (Id. (emphasis in original).) Mr. Coard further observed that "[Mr. Millan's] conduct and bearing are always the same, no matter the setting: humble, helpful, friendly, caring and compassionate. He is the model inmate. When a fellow inmate is in need, Mr. Millan-Colon will give what is his to help him. When a man is down, he will lift him back up. When I need a positive role model for other prisoners, I pick Eric Millan-Colon." (Id.)

Second, the Rev. Sergio C. Bicomong, a Catholic chaplain at FCI Fairton who has known Mr. Millan since 1995, reported that Mr. Millan is "honest and humble," "well-esteemed by his peers," and a "tremendous role{2020 U.S. Dist. LEXIS 34} model for his peers." (Exhibit 36.) From a religious perspective, Rev. Bicomong has "witness[ed] the spiritual growth and the model inmate [Mr. Millan] has become." (Id.) Indeed, Rev. Bicomong noted that Mr. Millan's "invaluable role as a church elder has been a fountain of inspiration for his fellow inmates" and that Mr. Millan "has shown a zeal and devotion to" his religious life. (Id.) Perhaps most notably, Rev. Bicomong described how Mr. Millan's "daily acts of kindness put him in rare company." (Id.)

Third, the Rev. J.E. Trahan, a BOP Chaplain, told of how "[o]pinions of Mr. Millan that were shared with me by staff and inmates [at FCI Fairton] reflect that his demeanor was the same throughout the institution regardless with whom he was interacting" and that "[h]is actions proved to be a major benefit in the smooth operation of the Religious Services Department, not only in Spanish and

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

English Christian communities in which he was heavily involved, but also in interacting with other faith groups." (Exhibit 37.) Also, Rev. Trahan reported that Mr. Millan has for years "assisted newly arriving inmates in adjusting to the religious programs available and was an excellent communicator{2020 U.S. Dist. LEXIS 35} with both staff and inmates." (Id.)

Fourth, Dr. Brian Redondo, the Chief Psychologist at FCI Fairton, has known Mr. Millan for almost 20 years, praised him as "a conscientious and reliable individual" who is "meaningfully engaged in all aspects of programming and routinely displays a positive demeanor." (Exhibit 38.) His relationship with Mr. Millan "began through [Mr. Millan's] involvement in various personal growth programs targeting his lifestyle choices, decision making, parenting from a distance, etc." (Id.) Dr. Redondo reported that Mr. Millan's "investment in treatment, combined with his leadership and communication skills and ability to work with diverse peer groups, led to his inclusion in some of the Psychology Services Department's most prestigious programming." (Id.) But "what has impressed" Dr. Redondo "the most about Mr. Millan-Colon is the consistency he has demonstrated, in both attitude and behavior, over the 17 years I have known him, and the fact that much of his involvement in personal growth and development came at a time when he has already resigned himself to life imprisonment." (Id.) Like his BOP colleagues, Dr. Redondo also noted that Mr. Millan "has been a{2020 U.S. Dist. LEXIS 36} model inmate during his incarceration at FCI-Fairton." (Id.)

Fifth, BOP Chaplain Daniel D. Cho, who has known Mr. Millan for more than 20 years, advocated for Mr. Millan as follows: "As a man of God myself, I know that [Mr. Millan] has committed a crime in the past. However, he is a changed and wonderful man of God, a great minister, a boundless mentor, and a wonderful father. I believe that he is completely ready to return to our normal community." (Exhibit 39.)

Finally, Mr. Millan has only three minor disciplinary violations over the course of his almost 30 years behind bars (Exhibit 42). None of Mr. Millan's violations involved violence, weapons, gangs, narcotics, alcohol, or BOP staff. (Id.) Rather, his three disciplinary violations involved the possession of too many postage stamps, which are used as a substitute for United States currency (which inmates are prohibited from possessing) for wagering on professional sports. (Id.) The Court finds Mr. Millan's actions while incarcerated for almost 30 years demonstrate exceptional character.

D. Mr. Millan Is a Leader of the Religious Community at FCI Fairton

Mr. Millan has ascended to a "leadership role within the church at [FCI] Fairton"{2020 U.S. Dist. LEXIS 37} and "stand[s] out from among the other men and quickly showed a depth of Christian maturity and wisdom that was much needed for those just coming into the penal system and those inmates who were struggling with their new found faith." (Exhibit 40.) And he serves as a "role model" for those who join the church, where he "teach[as] biblical expositions and participate[s] in other various functions of Christian ministry." (Id.) As described in detail by Pastor David L. McMurray:

> It is my joy to hereby speak on behalf of Eric Millan. I have been involved in prison ministry on many levels for a very long time and have seen way too much "jail house religion." Eric does not fit into that category! His passion for God and his commitment to honor Him with his new life has never waned. His talk of forgiveness is never used to excuse or minimize his past offenses or their consequences. . . . His work ethic on his job, his leadership in their religious services, his influence with the other inmates, and even his reputation with the correctional staff all point to a genuinely changed life. . . . He has never been bitter, blaming, or bemoaning his circumstances. He accepts full responsibility for{2020 U.S. Dist. LEXIS 38} what he has done. He regrets it, and has turned from and repented of it. His focus is now on replacing that old life with a new and better one. . . . When I leave him after our visits, I always think I've received more than I [have]

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

given. His joyful smile and effusing optimism are unquenchable and compelling. I don't believe he's a fake.(Exhibit 34.) Likewise, as described by Chaplain Daniel D. Cho:

> Eric is a very dedicated Christian who has never missed a single Sunday service. He always serves the Lord with a faithful heart and has served in the Prison Chapel for the past 17 years. . . . Eric is not only a sincere Christian; he is also a great mentor. His spiritual guidance powerfully affects many inmates' lives. Due to his great example, many inmates have also changed their lives in a positive way.(Exhibit 39.) See also Exhibit 37 ("Mr. Millan has been a productive and positive inmate in all that I have observed. He made beneficial contributions to the Religious Services Department through his consistent willingness to offer whatever skills he had to assist and enhance the religious programs and staff-inmate communications"). The Court finds that Mr. Millan has become an extraordinary{2020 U.S. Dist. LEXIS 39} leader of the religious community at FCI Fairton.

E. Mr. Millan's Commitment to Working with At-Risk Youth and in Suicide Prevention

Since 2001 Mr. Millan has been a leader in FCI Fairton's R.O.P.E. Program ("Reaching Out to Provide Enlightenment"), in which inmates speak with at-risk youth about the poor decisions that landed them in prison and the different decisions those youth could and should make to avoid the same fate. As described by Michael Coard (the program's administrator), the R.O.P.E. Program is designed help:

> deter youth from lifestyles that may lead them to incarceration. Local youth from Pennsylvania, New Jersey and Delaware who have been identified as offenders or potential offenders visit the institution to undergo intensive program participation with R.O.P.E. facilitators. The facilitators' message clearly conveys the importance of gang awareness, drug awareness, goal setting, peer pressure management, <u>criminal</u> lifestyle identification, conflict resolution techniques and the importance of education.(Exhibit 43.)

The R.O.P.E. Program's ten facilitators (including Mr. Millan) were competitively selected from a population of approximately 1,400 inmates "for their extraordinary{2020 U.S. Dist. LEXIS 40} achievements within the institution and model conduct. They have shown a consistent willingness to tutor, help, and mentor other inmates as well as the young offenders. (Id.) Mr. Millan makes regular presentations to at-risk youth, in which he describes his background, how he came to be involved in selling drugs, his <u>criminal</u> conduct and his regrets. He also cautions against following in his footsteps, telling them the following:

> I could've been a successful pharmacist and contented father and husband, a man with a beautiful family, but instead, I'm in prison --a jailbird. I blew my shot, but you still have yours. So don't blow it! Give yourself a chance to live a productive life. Educate yourself and be a role model for your family. Set goals, make plans and strive to achieve them. Listen to your parents and those who love you. They want the best for you. Remember when you get into trouble, you hurt not only yourself, but also all the people who love you. If we love them, should we cause them pain and sorrow? No way! You may be thinking you're a soldier or a slickest--slicker than I was--and maybe you think you can outwit everyone. That's exactly the way I thought many years ago. I{2020 U.S. Dist. LEXIS 41} knew guys who had gone to jail, and they would give me advice. I wouldn't listen because I thought I was smarter than they were. Wrong again. Now I'm with them in prison. I don't want you to join us in here. Treasure your education, develop goals and implement them, and you will reap the precious rewards of life.(Exhibit 44.)7

Response to Mr. Millan's R.O.P.E. Program presentations has been nothing short of extraordinary. He has received dozens of letters (some of which are collected under Exhibit 45) from the at-risk

DISHOT                              13

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

youth with whom he spoke, who wrote (among other things):

> "I'm glad I went to your program because now I will think twice about ever being in a gang or to mess with drugs. What you and the other inmates are really inspirational and what your doing is grate."

> "[T]he talk we had changed the way I want to do things in the street. [B]efore I took the trip to prison . . . in the back of my mind I was a bad boy on the streets[.] I was a man on the streets[.] You told me that a man is a person that set goals take care of my baby. Thank you Eric for the good feedback."

> "Thank you for coming out. I thought that you was the best. I will be keeping in contact with you. I'm proud{2020 U.S. Dist. LEXIS 42} that you told us your story. I have people that I know that does what you did and I'm trying to get threw with them, but they aren't listening, but I will keep on trying."

> "Thank you for coming to our school and giving the kids something to reflect on, and look back to hopefully understand the consequences that come along with a crime."

> "You and the other inmates really helped me to understand that gangs and drugs are not a way of life."

> "I think by going to the ROPE program helped me opened my eyes up, because I was heading in the wrong direction. If I was to continue to do what I was doing, I would end up in your shoes, so thank you."

> "I learned a lot from this presentation and will never forget it. Thank you again for teaching us that we are people who can make something out of our lives."

> "The things ya'll talked about really encouraged me to stop fight and get my life together. I know what I want to be I want to be a nurse. I am going to finish school graduate from high school and go to college. I want to make something of my life. That's why I am going to change my life know."

All in all, the R.O.P.E. Program is successful in large part because of Mr. Millan's dedication{2020 U.S. Dist. LEXIS 43} and strength of character. As described by Administrator Coard: "[Mr. Millan] is consistently dependable and displays a strong personal commitment to the youth. He sparks enthusiasm and motivation in the youth. He displays an enthusiastic spirit, conveys a positive influence and shows confidence in dealing with the target audience." (Exhibit 43.)

In addition to his work as a R.O.P.E. Program facilitator, Mr. Millan is a "veteran" of the Suicide Watch Companion Team, having more than "[18] years of uninterrupted involvement in this program." (Exhibit 46.) According to Dr. Claude H. Dennery, the Suicide Watch Companion Team's clinical psychologist, Mr. Millan "has been far more than just a member of a select group, but quickly emerged as a leader to help others. Suicide companions—both old and new—seek him out for advice and direction." (Id.) Indeed, Mr. Millan "has always proven to be a reliable, hardworking, and one who volunteers his time and assistance beyond what is asked of him." (Id.) And that is why Mr. Millan has "earned a unique reputation among so many staff and his peers as an experienced, humble, and extremely pleasant individual." (Id.) Finally, as summed up by Dr. Dennery,{2020 U.S. Dist. LEXIS 44} who, among other things, stated that he would welcome Mr. Millan "as a neighbor" because he is "trustworthy" and "lives a life that is both prosocial and spiritual":

> I've always been able to look to [Mr. Millan] without reservation to serve as the finest example and mentor for so many other suicide companions which I have hired over his many years of

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

service. He exhibits a prosocial disregard for the perception of other inmates colluding with staff (by speaking with them), and will go out of his way to shake my hand and ask me how I'm doing! It is without hesitation that [I] would have Mr. Millan-Colon as a neighbor, as he's trustworthy, lives a life that is both prosocial and spiritual, and elicits the better qualities of those with whom he come[s] into contact.(Id.)

The Court finds that Mr. Millan has demonstrated extraordinary commitment to at-risk youth and suicide prevention.

### F. The BOP Staff at FCI Fairton Are Unwavering in Their Support for a Reduction of Mr. Millan's Life Sentence

The letters submitted by the BOP staff at FCI Fairton demonstrate "extraordinary and compelling reasons" to grant a sentence reduction. For example:

"Having met his family in the visiting room, I know{2020 U.S. Dist. LEXIS 45} that Mr. Millan-Colon has love and stability waiting for him outside this prison. I also believe that if Eric Millan-Colon were released today, he would become a heartwarming success story. He would carry the same values of humility, contrition, decency and charity out into the community. Eric Millan-Colon, the model inmate, would become Eric Millan-Colon, the model citizen." (Exhibit 35.)

"I write to testify of [Mr. Millan's] steady and consistent moral character and believe that he is no longer a threat to society but would rather prove as an asset. I am certain that he has served justice well for the crimes he had committed but should be given the opportunity to re-enter the free community." (Exhibit 40.)

"I truly believe that if he was to get relief from his life sentence without parole and eventually released back into society that he would be a model citizen and actually work to deter others from following his past footsteps. He has been a model prisoner and has been involved in all kind of programs while incarcerated. He has been a mentor to younger men coming into the prison system. He is a true Christian . . . . If you would get to meet Eric and see the big smile that is{2020 U.S. Dist. LEXIS 46} always on his face and talk with him I am sure you would realize that he is a changed man and would be an asset to his community and his country. He deserves a second chance." (Exhibit 41.)

"Mr. Eric Millan-Colon has turned his life around. He recognizes the mistakes that he has made and now dedicates his life to atoning for them, to redeeming himself. Mr. Eric Millan-Colon is a noble role model for anyone fortunate enough to know him. His laudable work ethic and dedication to the church convince me that he would become a productive and valued citizen should he leave prison. Out in society, he would again be a wonderful role model for anyone seeking redemption after making a mistake in life." (Exhibit 36.)

"Mr. Millan-Colon is a conscientious and reliable individual. . . . He continues to be invested in the lives of adult children and grandchildren (I have had the opportunity to meet all of them over the course of his incarceration through programs and visitation), solicits advice as to how he can become even more involved, and provides financial assistance from the money saved via his institution job." (Exhibit 38.)The Court finds the extraordinary support for Mr. Millan among BOP{2020 U.S. Dist. LEXIS 47} staff at FCI Fairton and their opinions that if released he would be a productive member of society to be a compelling factor in favor of release.

### G. Continuation of Mr. Millan's Life Sentence Constitutes an Unwarranted Sentencing Disparity

Except for Alfred V. Bottone (who was sentenced to life in prison and died behind bars), all but one8

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034

of Mr. Millan's co-defendants have been released. The following chart details the sentences (and release dates) of the individuals with whom Mr. Millan was charged and tried:

One key sentencing factor stressed by Congress in 18 U.S.C. § 3553(a) is "the need to avoid unwarranted sentence disparities" among similarly situated defendants. At the time of Mr. Millan's sentencing in 1994, this factor may well have helped to justify Mr. Millan's life sentence because a **{2020 U.S. Dist. LEXIS 48}** number of his co-defendants also received life sentences. But, as the chart above demonstrates, Mr. Millan's life sentence is now significantly out-of-line with those of his co-defendants. A reduction of Mr. Millan's sentence therefore is needed to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

## VI. CONCLUSION

Mr. Millan's extraordinary rehabilitation, together with his remorse and contrition, his conduct as model prisoner and man of extraordinary character, his leadership in the religious community at FCI Fairton, his dedication to work with at-risk youth and suicide prevention, and the support of BOP staff at FCI Fairton, including their opinion that if released, Mr. Millan would be a productive member of society and no danger to others, and the sentencing disparity that would result from further incarceration all constitute extraordinary and compelling reasons justifying a reduction in sentence. Accordingly, for all of the foregoing reasons, pursuant to 18 U.S.C. § 3582(c)(1)(A), Eric Millan's motion for a reduction of sentence (dkt. no. 1046) is granted, and his life sentence is reduced to time served.

SO ORDERED.

© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25958034